## JACKSON, *ex dem.* BENSON, *against* MATSDORF AND ANOTHER.

THIS was an action of ejectment for a farm in *Pawlings*, in the county of *Dutchess.* The cause was tried at the *Dutchess* circuit in *September*, 1812, before Mr. Justice *Yates.*

At the trial, the plaintiff read in evidence a deed, dated the 8th *December*, 1764, from *Matthias Marsh* and *William Marsh* to *Benjamin Benson*, for the premises in question, for the consideration of 112 pounds, with the usual covenants, and warranty; a deed, dated 9th *June*, 1766, from *Benjamin Benson* to *Keziah Benson*, expressed to be for *for the consideration of* 112 *pounds received from Ambrose Benson;* also a quitclaim deed from *James Morehouse* and *Keziah*, his wife, to *Benjamin Benson*, for the same premises, dated 3d *November*, 1786, for the consideration of 112 pounds. This deed was not acknowledged by the

*(margin note:* NEW-YORK, May, 1814. JACKSON v. MATSDORF *)*

*(margin note:* B. executed a deed of a farm, in 1766, to K., the infant daughter of A., " for the *consideration of* 112 *pounds received of A.*" The deed was not actually delivered to K., but remained in the possession of A., until it was afterwards surreptitiously taken away by K. and her husband; on which B. executed another deed for *)*

the same land to A. At the time of the deed, A. took possession of the premises, and continued in possession, using and claiming them as his own, from 1766 to the time of his death, about the year 1802. K. and her second husband, in 1786, executed a quitclaim deed for the same premises to B., for the consideration of 112 pounds.

In an action of ejectment, brought in 1812, by B. claiming under K. against a person claiming under A., it was held that the taking the deed in the name of K. was not an *advancement* to her, by A.; but was a *trust* for her father who paid the consideration money.

And being a *resulting trust*, it was not within the statute of frauds, but might be proved by parol.

It not being intended as an *advancement*, there was not a valid *delivery* of the deed to the trustee; and A.'s title became complete by length of possession.

But admitting a delivery of the deed so as to vest the legal estate in K., yet B. could not avail himself of the deed from K. to B. in 1786, B. having full knowledge, at the time, of the *trust* to A. And if that deed was not absolutely void, the person claiming under it was to be deemed a trustee for A. the real owner.

The lapse of time, in this case, was sufficient to warrant the presumption of a conveyance by K., the *trustee*, to A. the *cestuy que trust.*

The second deed from B. to A., with *warranty*, was sufficient to pass a title subsequently acquired by the grantor.

And the possession of A. being adverse, at the time of the deed from K. to B. in 1786, that deed was inoperative and void.

wife of *Morehouse*. The execution of the deeds was admitted by the defendants' counsel, but not the *delivery* of the deed from *Benjamin Benson* to *Keziah Benson*.

Many witnesses were examined, and a great mass of evidence taken at the trial, and detailed in the case, the whole of which it is not thought necessary to state here: the following are the material facts in the case.

*William Payne*, a witness for the plaintiff, testified, that after *Benjamin Benson* purchased the premises in question, of *M.* and *W. Marsh*, he lived on the farm until he and *Ambrose Benson* exchanged farms, when *Ambrose* entered into possession of the premises. *Keziah Benson*, who was the daughter of *Ambrose*, was under age, when her father took possession of the farm, and lived in his family. The father sometimes called the farm *Keziah's* land, and after her marriage with *Morehouse*, he called it *Morehouse's* land, and sometimes *Keziah's*. And when disputes arose in the family, he frequently said, he would send for *Morehouse* to come and take the land, and that *Morehouse* should have it. *Mary Matsdorf*, a daughter also of *Ambrose Benson*, lived with her father. She lived with her first husband, *Clear*, a short time, in *Connecticut*, but during most of the time resided in her father's family. She and her mother chiefly managed the business. *Ambrose Benson* died 10 or 12 years ago, and *Benjamin* died about two or three years since. The witness further stated, that he had heard the declarations of *Ambrose Benson* above mentioned, at different times, for many years, and towards the close of his life; and that since the sale back to *Benjamin Benson*, he heard *Benjamin Benson* say that he had purchased the land. That *B. Benson* called him to witness his forbidding *Mary Matsdorf* building on the farm. She was then erecting a building of stone in addition to the house. *Ambrose Benson* was present, and heard *Benjamin* forbid her building, and she told him to go away and mind his own business, and not interrupt her. *Ambrose Benson* said nothing; nor did *Mary Matsdorf* say she had any claim to the land. The witness heard *Ambrose Benson* say that *Benjamin* should have the land, but without assigning any reason.

*John Payne*, a witness for the defendants, testified, that after the exchange of farms between *Benjamin* and *Ambrose*, the latter took possession of the farm in question, and continued in possession until his death, which was about 12 years ago. His

daughter *Mary* lived with him, and since his death has been in possession, except when put out by a former action of ejectment. Soon after the deeds were executed, about 40 years ago, *Benjamin Benson* told the witness that he and *Ambrose* had exchanged farms, and that for particular reasons, *Ambrose* did not choose to take the deeds in his own name. The deeds for the lands in *Connecticut* were in the name of *Mary* and *Hannah*, his daughters, and the deed for the lands in *New-York* were to *Keziah*. *Ambrose* was under some difficulties; and the deeds were not recorded, as *Ambrose* did not know but that he might wish to take them up and have others given for different lands, in his own name.

After *Mary* was married, *Benjamin Benson* said that *Ambrose* had left his chest, containing the deeds, in the house of *Benjamin Benson*, as he did not know but some of the family might get hold of them. When *Benjamin Benson* was absent from home, and his wife sick, *Mary*, and her husband, *Patrick Clear*, and *Keziah*, went to his house, took the chest, carried it into the woods, and there broke it open and took out the deeds. *Benjamin Benson*, on his return home, being informed of what had been done with the chest, told it to *Ambrose*, and they went to *New Milford*, and there new deeds were made to *Ambrose;* but how they were made out, whether separately or not, the witness did not know. It was intended to have them recorded, but *Clear* had been to the clerk and had got the other deeds recorded first. The witness said the reason why the deeds were not taken in the name of *Ambrose* was on account of a bond which *Ambrose* feared might be prosecuted against him. That *Ambrose* said he did not own any of the children, except *Mary*, *Hannah* and *Keziah*, who should have his property, but that the others should have none.

Another witness, *J. Hoag*, also testified that *Ambrose* used the premises as his own until his death, about 10 or 12 years ago; that since his death *Mary* had been in possession, except when turned out by a former action of ejectment. *Benjamin Benson* told to the witness at different times, that *Ambrose* was in trouble, and that the deeds were given to his daughters, so that the lands should not go to pay the bond; that he and *Ambrose* had exchanged lands, and after the deeds were given, they were put into a chest, which was carried to *Benjamin Benson's* house to be kept, and the witness understood that if *Ambrose* got clear of his difficulty about the bond, the deeds were to be taken up and new deeds were to be given to *Ambrose*. After the deeds were

taken away by *Mary*, her husband and *Hannah*, as before stated, *Benjamin* and *Ambrose* went to *Connecticut*, and there new deeds were executed to *Ambrose;* but *Clear* had got the other deeds recorded. The deeds were separate; the one for lands in *Connecticut* was to *Mary* and *Hannah*, and the one for lands in this state was to *Keziah*. The first conversation between the witness and *B. Benson* was before the deed from *Morehouse* to him, and another conversation was since and before the death of *Ambrose*, and the story told by *B. Benson*, at both times, was the same. The witness never heard *Benjamin Benson* claim the lands until since the death of *Ambrose*. A few years before his death, *Ambrose Benson* desired the witness to write his will, and said he wished to give the property to *Mary* and her children, and that *Benjamin Benson* might try to get it from them.

The counsel for the plaintiff objected to any evidence of the declarations of *Ambrose Benson*, but the judge overruled the objection.

Another witness testified to conversations with *Benjamin Benson*, in which he stated the same facts about the deeds, as above stated, and said he kept them for *Ambrose*.

*James Morehouse*, who was called by the defendants, said that after he married *Keziah Benson*, her father, *Ambrose*, told him he had given her a deed, but it was not intended that she should have it, and that he meant the lands should go to *Mary* and her children. The declarations of *Ambrose Benson* were objected to, but the evidence was admitted by the judge. The witness further testified, that after he was informed there was a deed to his wife, he inquired of his father about it, who told him the land was the property of the state, and never could be recovered. The witness never made any claim for the property, and had given up the idea of any claim, thinking he might look to *Benjamin Benson*. About 7 or 8 years after his marriage with *Keziah*, *Benjamin Benson* told him the deed to her was a fraud, that it never was intended for her, that the title from *M. & W. Marsh* would fail, and that the land belonged to the state; that as the deed was with covenants, he wished to have it back and to be discharged; that the deed had never been delivered, but had been taken away from his house. The witness never consulted with *Ambrose Benson* about giving the quitclaim to *Benjamin Benson*. The witness said he never claimed or expected to get the land. But it appeared that he had said, on a former trial, that

he had consulted with *Ambrose Benson*, before he gave the quit-claim deed. The witness, however, said his recollection was not clear; that he thought his wife sent to *Ambrose Benson* and his family to ask about it, and they sent back word they might do as they pleased about selling to *B. Benson*.

A verdict was taken by consent, for the plaintiff for six eighths of the premises, subject to the opinion of the court on a case.

*J. Tallmadge* and *P. Ruggles*, for the plaintiff, contended, 1. That the evidence of the declarations of *Ambrose Benson*, in hostility to the title of the lessors, was inadmissible; and that the testimony of *James Morehouse* ought not to have been received.

Though in favour of the possession, all things will be presumed to be regularly transacted; yet when, as in this case, there is evidence of an intention to the contrary, there can be no ground for the presumption.*

* *Burr. Rep.* 1073.

This was an *advancement* to *Keziah*, the daughter, not a trust for the father. Where a father purchases land in the name of his son, this is considered as an advancement for the son, and not a trust; and it is laid down to be clearly so, where the child in whose name the deed is taken has not already been advanced.† It may be said that a *resulting trust* may be proved by parol. So, also, may it be rebutted by parol; and the evidence clearly shows that *Ambrose Benson* intended this land as an advancement to his daughter. [Here the counsel discussed the facts in the case.]

† 1 *Ch. Cases,* 27. 296. 2 *Ch. Cas.* 231. 2 *Freem. Rep.* 252. 1 *P. Wms.* 608. 2 *Vern.* 19.

*Emott*, contra, contended that there had not been such a *delivery* of the deed under which the lessors claim as would transfer a title. But admitting, even, that there was a delivery of the deed, so as to make it a valid conveyance, yet as the consideration money was paid by *Ambrose Benson*, there was a *resulting trust* to him. The deed not only states the fact, but all the witnesses prove that *Ambrose Benson* paid the money for the land. This being a resulting trust, it is not within the statute of frauds, and parol evidence is admissible to show the trust.‡

‡ 1 *Johns. Cas.* 153. 3 *Johns. Rep.* 216—221.

Again, here was an uninterrupted possession for near 40 years, by *Ambrose Benson*, the supposed *cestuy que trust*. After such

a lapse of time, the law will presume a conveyance to him from the trustee.

It is said, that this was an *advancement* to *Keziah Benson*, and not a trust for her father, for the proof of a trust is rebutted by the plaintiff's evidence. But the facts in the case do not support the position that this was an advancement.

THOMPSON, Ch. J. delivered the opinion of the court. It is a well settled rule of law, that if *A.* buys land and takes a conveyance in the name of *B.*, it is a resulting trust for him who paid the purchase-money, raised by implication of law, and, therefore, not within the statute of frauds. The defendants in this case claim under *Ambrose Benson*, who, it is admitted, paid the consideration money; but the deed of the 9th of *June*, 1766, was taken in the name of his daughter *Keziah*, under whom the lessor of the plaintiff claims, by deed, dated *November* 3, 1786.

It is a question which has often been agitated in chancery, whether, when a parent purchases land in the name of his child, it shall be deemed a *trust* for the father, or an *advancement* for the child. When the child is under age, it has generally been considered an advancement; though Lord *Hardwicke*, in the case of *Stileman* v. *Ashdown*, (2 *Atk.* 479.) said he thought the cases on that subject had gone full far enough. But no case will be found, where a purchase so made has been held an advancement, when it expressly appears to have been the intention of the parent that it should not be considered as such, as it does in the case before us. It is in proof, derived from the confessions of the lessor himself, who was the grantor, that the deed was given to the daughter for the purpose of avoiding some expected difficulties, and with an understanding that when *Ambrose Benson* should get rid of those difficulties, the deed was to be taken up and another given to *Ambrose* himself. This, doubtless, was the reason why the deed remained in the possession, or under the control, of *Ambrose*, until fraudulently taken away by *Keziah* and others. No objection was made to this evidence, nor indeed could any be made ; for it not only appears on the face of the deed to be a *resulting trust*, but such a trust, not being within the statute of frauds, may be proved by parol evidence. This was considered as a settled rule of law in the cases

of *Jackson* v. *Steenbergh*, (1 *Johns. Cases*, 153.) and *Foote* v. *Colvin*, (3 *Johns. Rep.* 216.)

If this is not to be considered an advancement to the daughter, as we think it clearly cannot, then there was no trust completed, by a delivery of the deed to the trustee. *Ambrose Benson* being the person beneficially interested, and retaining the deed in his own possession, no interest vested in the trustee. Had the deed been intended as an *advancement*, possibly the delivery to *Ambrose* might have been considered as accruing to the benefit of his daughter. And in this view of the case, the title of *Ambrose* was complete by length of possession.

But admitting a delivery of the deed, the interest created thereby was a resulting trust for *Ambrose Benson*, who paid the consideration money; and if the *legal estate* was, by that deed, vested in his daughter *Keziah*, the lessor of the plaintiff cannot avail himself of his purchase from her and her husband, in the year 1786, since he purchased with full notice of the trust, and was, therefore, guilty of fraud, although he might have paid a valuable consideration. (1 *Cruise's Dig.* 485. *Fonb. Eq.* b. 2. c. 6. s. 2. and note.) If that deed was not absolutely void, yet the lessor of the plaintiff would be considered a trustee for *Ambrose Benson*, who was the real owner; and, if necessary, the lapse of time is amply sufficient to warrant the presumption of an execution of the trust, by a release to *Ambrose*, the *cestuy que trust*. Besides, it appears from the confessions of the lessor, that upon discovering that the deed of 1766, given by him to *Keziah*, had been surreptitiously taken away, he gave another deed to *Ambrose Benson* himself, which deed, if it contained a warranty, would pass any title subsequently acquired by the grantor. (*Co. Litt.* 265. a.)

There is another and conclusive objection to the plaintiff's right to recover in this action, which is the adverse possession of *Ambrose Benson*, at the time the deed was given by *Morehouse* and his *wife*, in 1786, to the lessor of the plaintiff.(a) It is unnecessary to recapitulate the testimony on this point. An examination of it will abundantly show that *Ambrose Benson*, from the year 1766 until the time of his death, which was about ten or twelve years ago, continued in possession of the premises

(a) *Wickham* v. *Conklin*, (8 *Johns. Rep.* 220.) *Whitaker* v. *Cone*, (2 *Johns. Cases*, 58. *Woodworth* v. *Janes*, (2 *Johns. Cases*, 41.) 2 *Caines' Rep.* 147.

NEW-YORK, in question, using and improving them as his own, and in hostili-
May, 1814. ty to any right or claim that might be set up under the deed to
HIGHLAND *Keziah.* The circumstances stated by some of the witnesses,
TURNPIKE that he sometimes called the farm *Morehouse's* and *Keziah's,* is
COMPANY entitled to but little weight, in opposition to the mass of evi-
v. dence showing that he held it in defiance of that title. In what-
M'KEAN. ever point of view, therefore, this case is considered, there must
be judgment for the defendants.

Judgment for the defendants.