The Chancellor.
On or about the first of April, 1798, Abraham T. Peer and Daniel Peer, two of the defendants, *433 purchased of one Isaac Kingsland, for the consideration of fifteen hundred dollars, a tract of land in Morris county, containing about one hundred and thirty-eight acres, and received a deed for the same. They applied to the complainant to aid them in the payment of the purchase money, and she advanced two hundred and fifty dollars, being one-sixth of the purchase money. On the 19th of May, 1798, in consideration of the moneys so advanced by the complainant, Abraham and Daniel Peer executed and delivered to the complainant their joint and several bond, by which they bound themselves to the complainant in the sum of ¿£100, under the following condition: “ The conditions of the above said obligation is such that whereas the said Abraham and Daniel Peer is justly indebted to the said Nelly Peer in the above said sum of ¿£100, money as aforesaid, for which said sum the said Abraham and Daniel Peer do hereby promise to give her a good deed for the sixth part of the plantation that they lately purchased of Isaac Kingsland at the end of twelve years and a half from this date, and they do hereby promise to grant her such privileges of 'pasturing cows, and sheep, and other privileges on said farm, as will amount to the interest of the said sum yearly as above said during said term of twelve years and a half. But it is agreed between said parties to these presents, that if the said Nelly Peer at the end of twelve years and a half should not choose to have the sixth part of said plantation, then the said Abraham and Daniel Peer will pay said Nelly the said sum of one hundred pounds money as aforesaid without any other interest than what is herein specified.” Immediately upon the execution and delivery of this obligation, the complainant entered into the full enjoyment of all the privileges specified in the condition thereof, and continued to enjoy them for the term mentioned, of twelve and a half years. At the expiration of that time, there was set oft' a lot of land, containing by estimation thirty acres, which the parties mutually agreed to be the one equal sixth part *434 in quantity and value of the land mentioned in the agreement. The complainant then took possession of the same, and has had the continued possession up to the time of filing this bill. Why a deed was not given at the time, is not explained. It is alleged, it was owing to the ignorance of the parties, and that they supposed, with the obligation in the complainant’s hands, and the possession of the pi’operty, her title was complete. At the time the complainant took possession of the land, she had a son, an only child, Tunis Peer, who was living with her. . At that time he was about twenty years of age. He continued to live with her, on the premises, until his death, the first day of October, 1854. They lived together as one family, having everything in common. By their mutual contributions, improvements in buildings and otherwise were put upon the premises. On the 4th of March, 1835, Tunis Peer, with full knowledge that his mother had in her possession the obligation before mentioned, and of all the circumstances that had transpired in relation thereto, applied to Abraham and Daniel Peer for a deed of the land which they, under and by virtue of the said obligation, were bound to convey to his mother, and they accordingly, on the day last mentioned, executed and delivered to Tunis Peer a deed for the land which had been set off to the complainant. Upon running the land, finding that it was short, of the thirty acres, two and a half acres, they included in the deed to Tunis two and a half acres more, adjoining the tract in possession of the complainant. The defendants, Thomas S. Peer, Presson Peer, and Dianiha, wife of another defendant, Amos S. Kellinger, are nephews and the niece of Tunis Peer, deceased, and are his heirs at law, to whom the title of the land in question has descended. This bill is filed by the complainant to be relieved as to her title.
The facts of the case, as far as I have stated them, are not: disputed. Upon this state of facts, there can be no doubt as to the complainant’s right to relief. If it is true *435 that Turns Peer applied to Abraham and Daniel Peer for the deed, and without any authority appearing from his mother, received a deed for the land, then he received it as her trustee; and the title having descended to the defendants, as his heirs at law, they must hold it in the same capacity, and are trustees for the complainant.
But the defendants insist, that the complainant can claim title, only as a trust, resulting from the fact, that she advanced the purchase money, because, as they allege and insist, they have proved the deed was made to Tunis Peer with the consent of the complainant. They then insist that Tunis Peer, being the only child of the complainant, took the land beneficially, as an advancement from his mother, and that thus the resulting trust is rebutted.
It is evident that this defence has its foundation in the fact, that the deed was made to Tunis Peer, at the request, or at least with the consent, of his mother; for if he procured the deed to be made to himself without the complainant’s consent, there can be no pretence that it can be made to assume the shape of an advancement from the mother to her son. To assert that a title made to the son was an advancement by a parent to his child, when the deed was made without the knowledge or consent of his parent, is an absurdity. I do not think that the fact of such consent is satisfactorily proved. There is but one witness by whom it is attempted to prove that, prior to the deed’s being executed, the complainants consented that the deed should be made to her son. The rest of the evidence upon this point consists of circumstances from which the consent is sought to be inferred, and of conversations had between the complainant and others, in which she made admissions from which a like inference is to be drawn.
In the first place, it is proper to remark, that both Abraham and Daniel Peer declare that no request was made to them by the complainant to make out the deed to Tunis Peer, and that they never, after the execution of *436 the deed, had any intimation from her that she had, in any way, given her consent to it, or, after it was executed, acquiesced in it.
When Tunis Peer applied to the Peers to execute the deed, a Mr. Van Winkle was in company with him. Abraham Peer says, that he asked Tunis Peer “ if it was understood between him and his mother that it should be so: he said it was.” By which was meant, that it was understood, between him and his mother, that the deed should be made out to him. Mr. Van Winkle is dead. To 'legalize what was said by Tunis Peer, and to corroborate him in the assertion he is said to have made, it is attempted to be proved by Susan Lumpley, a witness examined for the defendants, that at an interview between the complainant, Tunis Peer, and Van Winkle, she was present, and heard the directions given to have the deed made out in the name of Tunis Peer. To the question — “Were any 'directions given by Mrs. Peer to Mr. Van Winkle about making a deed for the lands ?” the witness replied — “ she said she wanted a deed made out; but any further I don’t recollect anything about.” And upon further examination, the witness says, she “ heard Tunis, after that, tell his mother that he had got the deed for that land.” And this is the nearest the witness comes to testifying, either to her consenting that he should take the deed in his name, or to any knowledge on her part that it was made out in his name. I do not think that it is satisfactorily proved, by 'any witness, that she knew the deed had been taken in the name of her son. She frequently said he had a deed for the land; but this was said under circumstances to render it very doubtful whether she meant to be understood that the deed was in his name, or merely to assert the fact, that it was in his possession. But her conduct and declarations were always at variance with the idea that she had consented to the title’s being in him. She called the land her own, and occupied it as her own, and never, in anything she did, acknowledged the ownership in *437 any one else. We must, in examining the evidence, bear in mind that the witnesses are testifying to declarations made, and transactions which occurred, most of them, very many years ago. Thus when Susan Lumpley heard Tunis tell his mother that he had the deed. This consideration will show the importance of declarations being very definite and unequivocal where they are introduced for the purpose of depriving the complainant of her title in the land.
I do not deem it at all necessary that I should review the many circumstances upon which the defendants rely to prove the consent of the complainant to her son’s taking the title, and her acquiescence in it afterwards. It is enough for me to say, that after a careful consideration of them all, they have not produced an impression upon my mind unfavorable to the complainant’s rights. There is one circumstance, which was considered a very strong one, corroborative of the view taken on behalf of the defendants, which I will notice, as it has not struck my mind as being entitled to as much consideration as it was deemed by counsel.
John L. Kanouse testifies, that a few days before Tunis Peer’s death, the complainant sent for him, and told him she wanted him to draw an assignment of a certain bond to Tunis Peer. The witness then adds — “ that is I wish to say, that in effect she said that. I cannot state the words. She gave me to understand that.” Upon further examination, the witness says — “ She said she wanted mo to write an assignment of that paper, as she called it, so that it would make good the title to that property.” The witness further says, he went into the room to see Tunis Peer about it, but found him so sick that he could not attend to what was said. He then told the complainant, that under the circumstances, he being so sick and unable to converse about the matter, that he thought ho had better not draw the assignment.
If the witness has given us a faithful impression of *438 what occurred at the time, it appears to me it does not go to establish the fact, that Nelly Peer considered that she had done anything prior to that time which completed an advancement to her son. The obligation which she held was the evidence of her title, and she so considered it. She said she intended to keep it, and “ to have the loaf under her own arm as long as she lived.” But it is certainly very singular that the complainant, at such a time, should wish to assign the obligation to Tunis Peer, for the purpose of perfecting the title! in him. It was all the complainant’s living. Her son was on his death-bed. Such an assignment was of no value to him, while it turned her penniless on the world. These defendants were strangers to her. It is not pretended that it was with any purpose of benefiting them. But if the design was simply to place the title in Tunis Peer, why should the witness have declined drawing the assignment because Tunis Peer was too unwell to consult about it ? It was a matter about which no consultation with him was necessary, if the simple object of the complainant was as the witness now explains it. I think the cross-examination of the witness throws some light upon this matter. The complainant did want some writing done, but it was not a writing which would strip her of the property, and be of no benefit to her son, but it was, as the witness says she expressed it, “ to make good the title to that property.” It ■appears that some one had given her the idea, that if her son " died .while the title to the property remained as it was,' Abraham and Daniel Peer would get it. It is natural to suppose it was to protect her title, and to preserve to herself the. enjoyment of the property, that she wanted some writing executed. For such a purpose it was necessary to consult Tunis Peer, and his illness thus explains why some .writing was .not executed which would have avoided the embarrassment as to the title which followed his decease.
But admitting that the evidence is satisfactory to show *439 that the deed was made to her son with the consent of the complainant, the presumption, that it was intended as an advancement to the son, is satisfactorily rebutted by other evidence. This presumption of advancement may be overcome by parol — by declarations of the parties, and by circumstances eotemporaneous with the transaction itself. The authorities are not uniform as to what circumstances should be deemed sufficient evidence to rebut this presumption in favor of a child, which is founded in natural affection and moral obligation. I agree with the learned author, (2 S. Eq. J., § 1203,) that this presumption ought not to be frittered away by nice refinements ; but I think, as it is a mere presumption, the same kind of evidence which is deemed sufficient to create the presumption should be admissible to overcome it. The circumstances relied upon should be convincing, and of such a character as to leave no reasonable doubt as to the intention of the party. Proseus v. McIntyre, 5 Barb. S. C. Rep. 425; Dyer v. Dyer, notes, 1 Hare Walton, L. C. in Eq. 205; Jackson v. Matsdorf, 11 Johns. 91, 96.
In this case, we not only have the fact of the uninterrupted possession of the complainant for upwards of fifty years, but we have her claiming title in herself under a written agreement, rmder which she entered into the possession, and so continued up to the time of filing the bill. The complainant’s title to this land, or rather her right to the legal title, arises out of the written agreement of the 19th of May, 1798. She has always held her possession under that agreement. She always asserted her title under it. She now protects her title under it. The evidence upon this point is full and satisfactory. The agreement was not left in her hands through mere inadvertence, nor was it retained by her without a purpose. When Tunis Peer procured his deed, he promised Abraham Peer that he would deliver up this agreement. That he did not do so was because the complainant retained it for her own protection. One of the witnesses *440 testifies that Tunis Peer offered him a lot, if he would procure this agreement for him. It appears to me that the evidence is conclusive that the complainant retained that agreement in her possession as the evidence of her right to the land, and that Abraham and Daniel Peer, as well as Tunis Peer, regarded her keeping it in the same light. If this is so, it necessarily rebuts any presumption that she intended the conveyance to Tunis Peer as an advancement.
/ The complainant’s counsel take another view of the case. They insist that the complainant does not claim this land as a resulting trust; that it is an express trust created by writing, by the agreement of 1798, and that the complainant now demands the execution of that trust under that agreement. It appears to me that this position is correct. The complainant does not present the case of a trust resulting from her payment of the purchase money. It is not by parol testimony that she shows her title to the laud. She exhibits a writing under seal, and claims its execution. Such a trust cannot be destroyed by parol, nor will the law raise up any presumption to destroy it. A resulting trust, which is established by parol evidence, may be destroyed by evidence of a like nature. An express trust, created by writing, cannot be destroyed or defeated by parol. Nix. Dig. 307, § 13. Tunis Peer took 1ns deed with knowledge of the obligation held by the complainant. He took it subject to her rights under that obligation., and he cannot say, because he was her son, that there was a presumption of an advancement in his favor which destroyed the trust thus created. If a stranger had taken the deed, he would have taken the title as trustee for the complainant subject to the trust, not resulting from the fact of the complainant’s haviug paid the purchase money, but created by the obligation executed by Abraham and Daniel Peer. Tunis Peer took the title subject to the same trust. In any view I have been able to take of this case, I cannot consider Tunis Peer in *441 any other capacity than as trustee for the complainant. The title, at his death, having descended to the defendants, as his heirs at law, the title is in them in the same capacity.
The defendants insist, that if they are decreed trustees, they should he allowed the value of the improvements which Tunis Peer put upon the land. 'Under all the circumstances, I think no such allowance should he made. I do not believe that Tunis Peer assisted in putting them upon the land with the expectation of exacting from his mother any remuneration for them. They lived together on the premises, and mutually contributed to the improvement of them. He was an only son, and had he outlived his mother, he doubtless would have had the property. It was in this expectation that the improvements were made. It was defeated by his mother’s outliving him.
As to the costs. There is no reason why the defendants should pay costs to the complainant. It was through her negligence, in permitting the title to remain in Tunis Peer, that made this suit necessary. The defendants had the trust thrust upon them without their consent. They were ignorant of the circumstances, and are not to be condemned for defending the suit which was instituted against them. Neither party must recover costs against the other.